IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DARCI J. ROSE, | ) | 4:05CV3150 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## I.  INTRODUCTION

In this social security appeal, the plaintiff, Darci J. Rose, contends that a decision of the defendant, the Commissioner of the Social Security Administration, to deny her disability insurance benefits and supplemental security income benefits is contrary to law and not supported by the evidence.  After having carefully reviewed the record, I find that the Commissioner's decision should be reversed and the cause remanded for further administrative proceedings.

### A.  Procedural Background

Rose applied for Title II and Title XVI benefits on April 19, 2002, alleging that she became disabled on April 16, 2002, because of chronic leg pain and headaches (Tr. 53-55, 64-73, 341-45).  Her applications were denied initially on July 3, 2002, and on reconsideration on September 11, 2002 (Tr. 34-37, 40-44).

Rose filed a request for a hearing before an administrative law judge (ALJ) on November 5, 2002 (Tr. 45).  The hearing was held on September 29, 2004, and testimony was received from Rose and a vocational expert who appeared at the

ALJ's request (Tr. 348-82).  On October 14, 2004, Rose, through her attorney, amended her claim to assert only a closed period of disability, from April 16, 2002, to March 31,2004, and conceded that she had returned to substantial gainful work activity after that period (Tr. 51-52).

On November 19, 2004, the ALJ issued a decision that Rose was not entitled to disability insurance benefits or eligible for supplemental security income benefits during the alleged closed period of disability.  In reaching this decision, the ALJ evaluated Rose's claims through all five steps of the sequential analysis prescribed by 20 C.F.R.  §§ 404.1520 and 416.920, and he made the following findings:

1.   The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits . . . and is insured for benefits through the date of this decision.

2.   The claimant did not engage in substantial gainful activity during the alleged closed period of disability from April 16, 2002, to March 31, 2004 (Exhibit 6B, p. 1).  . . .

3.   The claimant's bilateral leg pain and impaired intellectual functioning impairment are considered "severe," based upon the requirements in the Regulations (20 CFR §§ 404.1520 and 416.920).

4.   This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5.   The claimant's allegations regarding her limitations during the alleged closed period of disability were not totally credible for the reasons set forth in the body of the decision.

6.   During the alleged closed period of disability, the claimant had the residual functional capacity for simple, repetitive work activity.

2

7.    The claimant was unable to perform any of her past relevant work, at least during the alleged closed period of disability (20 CFR §§ 404.1565 and 416.965).

8.    The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9.    The claimant has a "high school education" obtained in Special Education classes (20 CFR §§ 404.1564 and 416.964).

10.    The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

11.    Although the claimant's nonexertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. . . .

12.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 24-25)

Rose's request for a review of the ALJ's decision was denied by the Appeals Council on April 22, 2005 (Tr. 7-9). Her complaint was filed in this court on June 27, 2005. The matter is now fully briefed and ripe for decision.

## B.  Issues on Appeal

Rose argues that the ALJ erred in finding that her impairment did not meet or equal a listed impairment and claims that the evidence establishes she was disabled under Listing 12.05C for mental retardation.

# II. DISCUSSION

"Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the Commissioner] will find that [the claimant's] impairment meets the listing."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.  Thus, Listing 12.05 provides:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
> B.  A valid verbal, performance, or full scale IQ of 59 or less; or
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1.  Marked restriction of activities of daily living; or
> 2.  Marked difficulties in maintaining social functioning; or
> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.  Repeated episodes of decompensation, each of extended duration.

Id., at § 12.05.  "For paragraph C, [the Commissioner] will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits [the claimant's] physical or mental ability to do basic work

4

activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." Id., at § 12.00A.

In sum, to meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. Maresh v. Barnhart, ___ F.3d ___, 2005 WL 3288021, *2 (8th Cir. Dec. 6, 2005) (introductory paragraph is mandatory, but does not require a formal diagnosis of mental retardation). A claimant who is found to be mentally retarded under this listing is presumed disabled at step three without further inquiry. Chunn v. Barnhart, 397 F.3d 667, 671 (8th Cir. 2005).

In this case, the ALJ's decision contains no mention of Listing 12.05C, even though Rose's attorney advised prior to the hearing that the disability claim was being made pursuant to that listing (Tr. 117), and even though the ALJ found that Rose had a "severe" bilateral leg pain and impaired intellectual functioning. Indeed, the ALJ noted in his decision that Rose had IQ scores within the applicable range,[1] stating:

> A neuropsychological evaluation dated August 8, 2000, revealed the claimant's intellectual abilities were in the borderline range. On the WAIS-III, she was found to have a Verbal IQ of 69, Performance IQ of 74, and Full Scale IQ of 69. This was found to be not significantly

---

[1] "The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that [the Commissioner] can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Commissioner] use[s] the lowest of these in conjunction with 12.05.'" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D.6.c.

different from premorbid[2] intellectual functioning reported in school records.[3] Academic skills showed standard scores ranging from 67 in Math to 82 in Reading. . . . (Exhibit 11F).

(Tr. 20) Although not discussed by the ALJ, school records also show that Rose's intelligence was tested every three years between 1982 (first grade) and 1991, with WISC-R[4] scores recorded of 77, 75, 72, and 66 for verbal IQ; 67, 69, 74, and 74 for performance IQ; and 70, 70, 71, and 69 for full scale IQ (Tr. 93).

Despite having been apprised of Rose's specific reliance upon Listing 12.05C, the ALJ combined steps two and three of the required analysis, and summarily stated:

At the next step of the process, I find the claimant had the following impairments during the alleged close period of disability: Bilateral leg pains and impaired intellectual functioning, which are severe impairments within the meaning of the Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

(Tr. 18) Rose's IQ scores were discussed by the ALJ only in conjunction with his step-five assessment of Rose's residual functional capacity. Thus, the ALJ stated:

Viewing the evidence in the light most favorable to the claimant, I conclude that she had the residual functional capacity for sedentary work activity. In determining her residual functional capacity, I have

---

[2] Rose was involved in a serious motor vehicle accident on August 30, 1997, when she was 21 years old. She suffered a closed head injury, right parietal skull fracture, complex forehead lacerations, and bilateral femur fractures (Tr. 123-42).

[3] Roger H. Riss, the psychologist who tested Rose on August 8, 2000, reported that "[i]ntellectual testing conducted in April 1991 at age 15 and ½ yielded an estimate that [Rose's] overall mental efficiency fell at the 6th percentile relative to age peers." (Tr. 240)

[4] Weschsler Intelligence Scale for Children—Revised.

6

also considered the claimant's mental impairment. After my own careful and independent review of the record, I conclude the claimant has the mental capacity for simple, repetitive tasks. The claimant therefore had the residual functional capacity to perform the exertional and nonexertional requirements of "sedentary" work during the alleged closed period of disability from April 16, 2002, to March 31, 2004.

. . .

. . . She has borderline intellectual functioning; however, the IQ of record does not appear as a valid reflection of her actual functioning level. In this regard, she has held 2 jobs over considerable periods of time since the accident: gas station attendant, and operating a cash register and taking food orders in a restaurant. She earned above substantial gainful activity level on these jobs without any special conditions created for her. The claimant continues to live with her family, relies on her husband to do chores, drives about once a week, and handles money. She reads, swims, watches TV, and maintains some social relationships. She and her husband occasionally attend a movie or go out to eat. Certainly, these activities are consistent with the performance of at least simple, repetitive sedentary work on a maximum sustained basis.

(Tr. 21-22)

The Commissioner need not rely exclusively on IQ scores, and may disregard scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole. See Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005). This is especially true when the IQ scores are based on a one time examination by a nontreating psychologist. See Chunn, 397 F.3d at 672 (citing Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998)).

Rose correctly observes that the ALJ "offered no medical or psychological opinions as a basis for his rejection and recharacterization of the IQ identified by Dr. Riss [the licensed psychologist who administered the IQ test on August 8, 2000, and

7

opined that Rose's '[c]urrently measured IQ appeared to be non-significantly different than her premorbid intellectual functioning as reported in school records' (Tr. 238)]." (Filing 10, at 12)  To the extent such expert opinions may be necessary, however, they are contained in the record, in the form of psychiatric review techniques and mental residual functional capacity assessments completed by three licensed psychologists who reviewed Roses's file.  In fact, it is obvious from reading the psychologists' reports that the ALJ relied heavily upon them, and, while failing to identify the source of his information, incorporated much of their language directly into his decision. Those reports will be summarized briefly below.

On July 28, 2002, Linda Schmechel, Ph.D., concluded that Rose's impairment did not satisfy the diagnostic criteria for Listing 12.05 and, as part of a RFC assessment, wrote:

> Neuropsychological evaluation done at Madonna Rehabilitation Hospital 8/2000 by psychologist Riss shows WAIS-III[5] VIQ = 69, PIQ = 74, and FSIQ = 69.  This was found to be not significantly different from premorbid intellectual functioning reported in school records.  At the same time, academic skills showed standard scores ranging from 67 in Mathematics to 82 in Reading. . . .  On the WMS-III[6] she scored these index levels

> [table omitted]

> . . . This severity of memory problems coupled with mild to borderline cognitive ability—if tests are valid—might lead one to conclude she is disabled, yet I not[e] she's had two jobs since then: as a gas station attendant 2000-2001 and at Popo's restaurant, 1998-2002.  Page 8 of form 3369 says the Pop[o]'s was full-time, 8 hours/day for 5 days/week, running the cas[h] register and taking food orders, but ended because "I

---

[5] Wechsler Adult Intelligence Scale—Third Edition.

[6] Wechsler Memory Scale—Third Edition.

8

could not do any of this because of injuries.["] The mini-mart was also reportedly a full time job and she rang the gas in register but we do not have precise dates.

Claimant's own report of ADL shows she continues to live with family, relies on husband to do chores, drives only about once a week because it bothers her legs to ride far. She handles money, takes only Advil, seems to be keeping up relationships.

Claimant's mental condition in and of itself does not preclude work. The IQ of record does not appear a valid reflection of her actual functional level. The MVA in which she suffered multiple physical trauma but apparently no head injury[7] occurred 8/30/97. Dr. Riss' evaluation was three years later but ADL is not consistent with and seems to invalidate test scores. MER leads me to conclude she presents with borderline intellectual functioning at the very worst—the fact that she successfully worked as cashier in several different settings would suggest even higher functioning than that. Her mental condition imposes no marked limitations on RFC. IQ scores on record do not appear valid. . . .

(Tr. 270-71)

On August 30, 2002, and September 9, 2002, respectively, Lee Branham, Ph.D., and John W. Herdman, Ph.D., each concluded that Rose's impairment did not satisfy the diagnostic criteria for Listing 12.02 (organic mental disorders) and, as part of a RFC assessment, wrote:

Neuropsychological evaluation done at Madonna Rehabilitation Hospital 8/2000 by psychologist Riss shows WAIS-III VIQ = 69, PIQ = 74, and FSIQ = 69. Premorbid intellectual functioning reported in high school is at the 6th percentile, which would mean FSIQ 77, in the borderline, not MR range. . . . On the WMS-III she obtained index

---

[7] This statement is inconsistent with the record, including Dr. Riss's report, which recited that Rose suffered a mild closed head injury and skull fracture.

9

scores ranging 59-75.  He quotes Dr. Sorrell's diagnosis of mild closed head injury.

CE with Dr. Haigh on 5/28/02 gives a provisional diagnosis of cognitive disorder NOS—due to head trauma and GAF of 50 suggestive of moderate difficulties in functioning.  Dr. Haigh makes the above opinion, but in reviewing her report, claimant was generally able to understand, remember and carry out short and simple instructions and as pointed out in the next paragraph, her adaptive behavior does not support an inability, but moderate limitations. . . . Her MSE performance is consistent with borderline intellectual functioning, not an inability to sustain concentration and attention or to understand, remember and carry out short and simple instructions under ordinary supervision. [8]

The severity of memory scores coupled with borderline cognitive ability—if tests are valid—might lead one to conclude she is disabled, yet she's held two jobs over considerable periods of time since the accident: as a gas station attendant and running the cash register and taking food orders in a restaurant.  Jobs ended because of physical injuries.  She earned above SGA on these jobs, and apparently was working independently.  The tasks are above the MR level, again indicating adaptive functioning is not consistent with consideration under a 12.05 listing.

Claimant's own report of ADL shows she continues to live with family, relies on husband to do chores, drives only about once a week because it bothers her legs to ride far.  She handles money and seems to be keeping up relationships.

Claimant's mental condition in and of itself does not preclude work.  The IQ of record does not appear as a valid reflection of her actual functional level.  The MVA occurred 8/30/97.  Dr. Riss' evaluation was three years later, so any effects of brain damage would be considered permanent by then, but adaptive functioning, as measured by functioning in the home and her work history, is not at a MR level.

---

[8] The ALJ also adopted this finding without any attribution.

10

MER leads me to conclude she presents with borderline intellectual functioning, which would be consistent with her school records.

(Tr. 292-93)

While Rose argues that the ALJ, as a lay person, was not qualified to interpret raw data from IQ test scores, this is not what occurred in this case. Instead, it is apparent that the ALJ adopted the opinions of the three consulting psychologists who stated that Rose's IQ test scores from August 2000 were invalid because they were inconsistent with Rose's daily activities and work history. The ALJ's failure to cite to the consulting psychologists' opinions is not reversible error. A deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency has no practical effect on the outcome of the case. See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005).

The real problem in this case is that the consulting psychologists' opinions deal only with the IQ test scores from August 2000. They make no mention of the IQ test scores from 1982, 1985, 1988, and 1991 that are contained in Rose's school records and include multiple IQ scores in the 60-70 range. Thus, while Dr. Branham and Dr. Herdman noted that Rose was ranked at the 6th percentile in high school testing in 1991, and that this was equivalent to a full scale IQ of 77, they failed to discuss that IQ testing also performed in 1991 showed Rose had a verbal IQ of 66, a performance IQ of 74, and a full scale IQ of 69. Those scores are very close to the August 2000 scores (verbal IQ of 69, performance IQ of 74, and full scale IQ of 69).

Because the ALJ does not appear to have considered the record as a whole before finding that Rose's IQ test scores from August 2000 were not "a valid reflection of her actual functional level," his conclusion that Rose's impairment is "not severe enough to meet or medically equal one of the impairments listed" cannot stand. The case therefore will be remanded for further administrative proceedings to determine whether or not Rose is disabled under Listing 12.05C. Cf. Chunn, 397

11

F.3d at 672 (remanding for further findings where ALJ failed to support his finding at step three at it was not clear that he even considered Listing 12.05C).

## III.  CONCLUSION

I find that the Commissioner's decision to deny benefits is not supported by substantial evidence on the record as a whole.  In particular, I find that inadequate consideration was given to the applicability of Listing 12.05C.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document providing that the final decision of the Commissioner is reversed and the case remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

December 20, 2005.                    BY THE COURT:

                                      s/ *Richard G. Kopf*
                                      United States District Judge